**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee*,

v.

SUSAN JEANETTE RODRIGUEZ, AKA
Suzie Rodriguez,
      *Defendant-Appellant.*

No. 16-50213

D.C. No.
8:11-cr-00148-
JVS-24

OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted February 5, 2020
Pasadena, California

Filed August 20, 2020

Before: Sidney R. Thomas, Chief Judge, and Kim McLane
Wardlaw and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen

# SUMMARY[*]

### Criminal Law

The panel affirmed a defendant's convictions, for conspiracy in violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act and conspiracy in violation of the Violent Crimes in Aid of Racketeering Activity (VICAR), arising out of the defendant's role as "secretary" to a high-ranking member of the Mexican Mafia (La Eme).

Rejecting Rodriguez's challenges to the VICAR conviction, the panel held that the district court correctly gave a "substantial purpose" rather than "but-for-cause" instruction for the membership-purpose element, and that the evidence was sufficient to support the membership-purpose requirement.

The panel rejected the defendant's challenges to the district court's jury instructions on the RICO count and its special mid-trial instruction about the selection and admission of evidence. The panel wrote that even if the defendant's view of the jury instructions is correct—*i.e.*, that the district court supplanted the requirement that the government prove her "agreement" that a participant would commit racketeering acts with the weaker requirement that the government need only prove her "knowledge" or "contemplation"—the district court used the defendant's preferred formulation where it mattered, in laying out the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

elements of the offense.  The panel also held that if there were error, it would be harmless.  Rejecting the defendant's contention that the instructions erroneously broadened the basis for conviction beyond the scope of the RICO statute, the panel wrote that the defendant does not present a compelling reason to depart from the weight of authority upholding RICO convictions premised on attempts and conspiracies as predicate racketeering acts.  The panel held that the district court did not abuse its discretion in giving a mid-trial instruction about the selection of recordings introduced into evidence by the prosecution.

The panel held that the district court's instructions regarding the dual-role opinion testimony offered by two law enforcement witnesses were not plainly erroneous. The panel nevertheless emphasized that trial courts should endeavor to explain clearly the differences between lay percipient testimony, lay opinion testimony (as governed by Fed. R. Evid. 701), and expert opinion testimony (as governed by Fed. R. Evid. 702) in settings where all three arise.

Regarding the defendant's argument that the district court erred in admitting the testimony of two officers about the meaning of intercepted phone calls, the panel held that the district court misapplied the Rules of Evidence when it uniformly treated all of their interpretive testimony as expert opinion, irrespective of the specific foundation for any individual statement.  The panel reiterated that Rule 702 requires district courts to assure that an expert's methods for interpreting new terminology are both reliable and adequately explained.  The panel wrote that while the officers established the requisite personal knowledge to support some of their lay opinions, they failed to do so in numerous instances, and those portions of their testimony

were erroneously admitted. Upon consideration of the totality of the record, the panel held that the erroneously admitted testimony was harmless.

The panel held that the district court did not abuse its discretion in excluding proffered testimony by the defendant's sister. The panel wrote that the district court reasonably concluded that the only proffered testimony with meaningful probative value went to an unreserved duress defense—and that all other testimony in the proffer carried minimal probative force, substantially outweighed by the risk of unfair prejudice. The panel found that cumulative error does not provide a basis for reversal.

## COUNSEL

Davina T. Chen (argued), Sentencing Resource Counsel, Federal Public Community Defenders, Los Angeles, California, for Defendant-Appellant.

Robert J. Keenan (argued) and Joseph T. McNally, Assistant United States Attorneys; L. Ashley Aull, Chief Criminal Appeals Section; Nicola T. Hanna, United States Attorney; United States Attorney's Office, Santa Ana, California; for Plaintiff-Appellee.

**OPINION**

NGUYEN, Circuit Judge:

Susan Rodriguez appeals her convictions and sentence arising out of her role as "secretary" to a high-ranking member of the Mexican Mafia ("La Eme"). In 2011, as part of a large-scale prosecution, Rodriguez was indicted along with many other individuals for conspiring to conduct the affairs of the Orange County branch of the Mexican Mafia ("OCMM") through a pattern of racketeering activity including extortion, drug trafficking, and conspiracies and attempts to commit murder.

For approximately three years, Rodriguez served as "secretary" for Peter Ojeda, the leader of the OCMM, and for her ex-husband, Tommy Rodriguez. In that capacity, Rodriguez delivered messages among Eme members and their *mesas* (i.e. leadership teams), collected and disbursed "tax" money earned from extortion, and, ultimately, conspired to murder gang members who were deemed a threat to Ojeda's leadership.

Prior to trial, Rodriguez reached a favorable "package-deal" plea agreement with the government, but it fell through when Ojeda, who was included in the plea agreement, declined to allocute. After weeks of heated testimony and advocacy, the jury returned a guilty verdict against Rodriguez on two counts: (i) conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and (ii) conspiracy in violation of the Violent Crimes in Aid of Racketeering Activity ("VICAR") statute, 18 U.S.C. § 1959. Rodriguez was sentenced to 78 months imprisonment.

On appeal, Rodriguez raises numerous challenges to the trial court's jury instructions, its evidentiary rulings, and the sufficiency of the evidence.[1]  We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we affirm.

## I.  VICAR Membership Purpose

Rodriguez challenges her VICAR conviction on the grounds that the district court failed to properly instruct the jury on the membership-purpose element, and that the evidence of a membership purpose was insufficient to support her conviction.

### A.  *Jury Instruction*

To support a VICAR conviction, the government must show: "(1) that the criminal organization exists; (2) that the organization is a racketeering enterprise; (3) that the defendants committed [or attempted or conspired to commit] a violent crime; and (4) that they acted for the purpose of promoting their position in [or gaining entrance to] the racketeering enterprise." *United States v. Bracy*, 67 F.3d 1421, 1429 (9th Cir. 1995); *see* 18 U.S.C. § 1959.  The parties agree on this general framework but dispute what exactly the fourth element, the membership-purpose element, requires.  Rodriguez argues that the government must prove that a membership purpose—gaining entrance to, or maintaining or increasing her position in, the OCMM—was the but-for cause of her conduct.  The government argued for, and the district court applied, a

---

[1] Rodriguez also appeals her sentence, which we address in a memorandum disposition filed concurrently with this opinion.

lesser "substantial purpose" standard.[2]   We hold that the district court properly instructed the jury on the elements of a VICAR conspiracy.

We held in *United States v. Banks*, 514 F.3d 959, 970 (9th Cir. 2008), that the VICAR statute is limited "to those cases in which the jury finds that one of the defendant's general purposes or dominant purposes was to enhance his status or that the violent act was committed 'as an integral aspect' of gang membership." Recognizing that "[p]eople often act with mixed motives," we rejected a more stringent reading of VICAR that would require the gang or racketeering enterprise purpose to be the "only purpose" or the "main purpose" behind the violent conduct. *Id.* at 969; *see also id.* at 968 (concluding "that the purpose element does not require the Government to show that the defendant was solely, exclusively, or even primarily motivated by a desire to gain entry into, or maintain or increase his status within, the criminal organization"). We emphasized that "[i]t would make little sense to provide a safe-harbor . . . for gang members who can offer a plausible alternative motivation for their acts." *Id.* at 967. However, we

---

[2] The court gave the following jury instruction:

> With respect to the fourth element of Count Two, it is not necessary for the government to prove that the required motive was the sole purpose, or even the primary purpose of the defendant in conspiring to commit the charged crime. You need only find that enhancing the defendant's status in the alleged enterprise was a substantial purpose of the defendant or that the defendant conspired to commit the one or both of the alleged crimes of violence (*i.e.*, murder or assault resulting in serious bodily injury) as an integral aspect of membership in the enterprise.

explained, the membership purpose "does have to be a substantial purpose." *Id.* at 969.

Rodriguez acknowledges *Banks* but contends that the Supreme Court's intervening decisions in *Burrage v. United States*, 571 U.S. 204 (2014), and *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833 (2018),[3] mandate "[a] minimum of but-for causation." We disagree.

In *Burrage*, the Supreme Court evaluated the level of causation required to trigger the Controlled Substances Act's 20-year mandatory minimum sentence for drug distribution offenses when "death or serious bodily injury results from the use of such substance." 571 U.S. at 206 (quoting 21 U.S.C. § 841(a)(1), (b)(1)(A)–(C)). *Burrage* held that the "results from" language in the Controlled Substances Act established a but-for causation requirement. *Id.* at 218–19. It explained that the phrase "results from" imposes "a requirement of actual causality," and that a "but-for requirement is part of the common understanding of cause." *Id.* at 211. It added that courts have routinely interpreted similar language—including "because of," "based on," and "by reason of"—to require a but-for causal relationship. *Id.* at 212–14.

*Burrage*, however, is not clearly irreconcilable with our decision in *Banks*, so *Banks* remains binding precedent in this circuit. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). The two cases grappled with entirely

---

[3] We fail to see the relevance of *Husted*, so we center our discussion on *Burrage* instead. *Husted* held that the phrase "by reason of" in the National Voter Registration Act's ("NVRA") Failure-to-Vote Clause imported a "sole causation" standard. 138 S. Ct. at 1843. But the Supreme Court's decision hinged almost entirely on statutory context, tailored specifically to the NVRA. *Id.* at 1842–43.

distinct statutes, in an analytic exercise that is heavily dependent on context. Our detailed analysis of the structure, context, and purpose of the VICAR statute is in no way undermined by the Supreme Court's evaluation of the Controlled Substances Act in *Burrage*. In addition, the "results from" language evaluated in *Burrage* differs materially from the "for the purpose of" language assessed in *Banks*. The latter phrase concerns motive whereas the former concerns causation, such that the causation-oriented reasoning of *Burrage* does not readily extend to the VICAR purpose requirement. Reinforcing the conclusion that *Banks* remains intact, we reiterated its holding in *United States v. Smith*, 831 F.3d 1207, 1217–18 (9th Cir. 2016), which was decided more than two years after *Burrage*.[4]

The substantial purpose instruction given by the district court closely tracks our framing from *Banks* and *Smith*. *See Smith*, 831 F.3d at 1218 ("As we made clear in *Banks*, in the gang or racketeering area, when a person has two criminal purposes neither has to dominate (be the main purpose), but then neither can be 'merely incidental' either. More simply put, perhaps, both purposes must be substantial."); *Banks*, 514 F.3d at 969 (explaining that "the gang or racketeering enterprise purpose does not have to be the only purpose or the main purpose of the murder or assault[,] [b]ut it does have to be a substantial purpose"); *id.* at 970 (holding that the VICAR purpose element is also satisfied where "the violent act was committed 'as an integral aspect' of gang membership"). Because *Banks* and *Smith* remain good law, the district court correctly gave a "substantial purpose"

---

[4] We also note that the Sixth Circuit agreed with *Banks*' formulation of the VICAR purpose requirement, in a decision that issued seven months after *Burrage*. *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014).

rather than "but-for cause" instruction for the VICAR purpose element.

## B. *Sufficiency of the Evidence*

Rodriguez also contends that the evidence was insufficient to satisfy VICAR's membership-purpose requirement. She argues that the government failed to prove she acted with any membership purpose at all, and, in the alternative, that the government failed to prove a membership purpose was the but-for cause of her conduct.[5]

We review sufficiency of the evidence de novo. *United States v. Bennett*, 621 F.3d 1131, 1135 (9th Cir. 2010). "A claim of insufficient evidence fails if 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Although the government's evidence as to a membership purpose was not overwhelming, Rodriguez falls short of meeting the high standard applicable on sufficiency-of-the-evidence review.

To satisfy the VICAR statute, the government did not need to prove that Rodriguez was considered an official member of the Mexican Mafia. The VICAR statute speaks of maintaining or increasing one's "position" within the enterprise—a broad term that encompasses the ringleader of an Eme faction as well as the less formalized role of his "secretary." *Accord United States v. Brady*, 26 F.3d 282, 289–90 (2d Cir. 1994) (rejecting the defendant's argument

---

[5] Because we reject Rodriguez's proposed but-for cause requirement, we assess her sufficiency-of-the-evidence challenge instead through the substantial-purpose framework discussed in the preceding section.

that his VICAR conviction should be reversed because he was a mere associate, rather than a "made member," of a crime family). We further note that the enterprise charged in the indictment broadly encompassed the organization's "leadership, membership, and associates." The indictment's framing reinforces that official Eme membership was not a prerequisite to a VICAR conviction here. *Accord id.* at 290 (upholding the VICAR conviction of an "associate" of a crime family, where the enterprise charged in the indictment included both "members and associates" of the crime family).

The government presented sufficient expert and percipient testimony, as well as recorded conversations and seized correspondence, to establish that Rodriguez served as an Eme secretary and facilitated acts of violence as a part of that role. The conduct at the center of the VICAR count is inextricably tied to Rodriguez's position as secretary— principally, her dissemination of communications to direct the activities of Ojeda's *mesa*, including instructions to murder or otherwise inflict violence upon those who threatened Ojeda or the people loyal to him.

Although Rodriguez offers a more innocuous alternative explanation for her conduct, we must view the evidence in the light most favorable to the government and presume the jury resolved all conflicts against her. *See United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc). The jury *could* have accepted Rodriguez's version of events, but the evidence did not mandate that it do so. And notably, Rodriguez's proffered narrative, i.e., that she acted out of a desire to protect herself and her family, is not inconsistent with a VICAR membership purpose. This VICAR element focuses not on the defendant's purpose for gang affiliation, but rather on whether that gang affiliation motivated the

relevant conduct.  For these reasons, we find that sufficient evidence supports Rodriguez's VICAR conviction.

## II.  RICO Jury Instructions and Mid-Trial Instruction

We next address Rodriguez's challenges to the district court's jury instructions on the RICO count and its special mid-trial instruction about the selection and admission of evidence.

We review de novo whether a jury instruction misstates the law.  *United States v. Cortes*, 757 F.3d 850, 857 (9th Cir. 2014).  However, we review the "language and formulation" of a jury instruction for abuse of discretion.  *Id.*  Jury instructions must be evaluated "as a whole, and in context," rather than in piecemeal.  *United States v. Stapleton*, 293 F.3d 1111, 1114 (9th Cir. 2002).  A preserved instructional error warrants reversal unless it is harmless beyond a reasonable doubt.  *United States v. Montoya-Gaxiola*, 796 F.3d 1118, 1124 (9th Cir. 2015).  An unpreserved objection is subject to plain error review.  *United States v. Murphy*, 824 F.3d 1197, 1204 (9th Cir. 2016).

### A.  Instructions Regarding Agreement

Rodriguez does not dispute that the district court gave an accurate jury instruction listing the elements of Count 1, the RICO charge.  That instruction, Jury Instruction 32, required the government to prove five elements to sustain a RICO conviction, with the fifth element that Rodriguez "agreed that one or more participants in the conspiracy . . . would commit at least two racketeering acts."  Rodriguez contends, however, that the court twice supplanted the requirement that the government prove her "agreement" that a participant would commit racketeering acts with the weaker

requirement that the government need only prove her "knowledge" or "contemplation" that a participant would commit racketeering acts. Specifically, Jury Instruction 42 elaborated, in relevant part, as follows:

> Now that I have instructed you on the various types of racketeering, I will return to the fifth element of Count 1: the defendant agreed that one or more participants in the conspiracy, not necessarily the defendant, would commit at least two racketeering acts.
>
> You must all agree beyond a reasonable doubt as to which type or types of racketeering activity you find that the defendant knew or contemplated would be committed by one or more members of the conspiracy.

The court also gave a similar admonition earlier; in one of its racketeering instructions, the court directed the jurors that they "must all agree beyond a reasonable doubt as to which type or types of racketeering activity you find that the defendant knew or contemplated would be committed by one or more members of the conspiracy."

Even if Rodriguez's view of the jury instructions is correct, her argument nevertheless fails. The district court used Rodriguez's preferred formulation where it mattered, i.e., in laying out the elements of the offense. Rodriguez's challenge arises from subsidiary language in the court's unanimity charge—which bore only on juror unanimity as to the types of racketeering activity involved in the RICO conspiracy. Therefore, even accepting the premise of Rodriguez's argument as true, we find no reversible error

when the jury instructions are considered "as a whole, and in context." [6] *Stapleton*, 293 F.3d at 1114.

Finally, we note that, if there were error, it would be harmless. The collectivity of the jury instructions communicated clear guidance about the agreement required to support a RICO conviction, mitigating any potential confusion from stray remarks by the court. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991) ("It is well established that [a jury] instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." (internal quotation marks and citation omitted)); *United States v. Garcia*, 729 F.3d 1171, 1178 (9th Cir. 2013) (explaining that harmless error includes the consideration of "whether the element at issue is sufficiently explained, given the totality of the instructions"). The district court undisputedly gave a proper agreement instruction when delineating the elements of the offense and, in its conspiracy instructions, further clarified that mere association with or knowledge of a conspiracy does not equate with co-conspirator status. Moreover, there was significant evidence presented at trial that implicated Rodriguez in an active role in multiple predicate acts. For these reasons, we find no basis for reversal on the claimed instructional error.

## B.   *Instructions Regarding Attempt and Conspiracy as Predicate Acts*

The district court, over Rodriguez's objection, instructed the jury on predicate racketeering acts encompassing

---

[6] We also note that the district court gave general jury instructions on conspiracy that correctly explained that mere association with or knowledge of a conspiracy does not make someone a conspirator.

attempts and conspiracies to commit murder, extortion, and drug trafficking. Rodriguez contends that these jury instructions erroneously broadened the basis for conviction beyond the scope of the RICO statute, because attempts and conspiracies do not qualify as predicate racketeering acts.

The RICO statute defines racketeering activity to include "any act or threat involving murder, . . . [or] extortion, . . . which is chargeable under State law and punishable by imprisonment for more than one year"; and "any offense involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance . . . , punishable under any law of the United States." 18 U.S.C. § 1961(1)(A), (1)(D). Rodriguez argues that our recent decision in *United States v. Franklin*, 904 F.3d 793 (9th Cir. 2018), and the Supreme Court's decision in *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003), counsel a narrow interpretation of the term "involving" that does not extend to attempts and conspiracies.

We have long adhered to the principle that "[a] series of conspiracies and failed attempts constitutes a 'pattern of racketeering activity' within the meaning of 18 U.S.C. § 1961(5), even if no racketeering offense is completed." *United States v. Brooklier*, 685 F.2d 1208, 1216 (9th Cir. 1982) (per curiam); *see also United States v. Fernandez*, 388 F.3d 1199, 1259 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005) ("It is a well-established principle of RICO law that a murder conspiracy can be a predicate racketeering act under § 1962(c), and that predicate racketeering acts that are themselves conspiracies may form the basis for a charge and eventual conviction of conspiracy under § 1962(d)." (internal citations omitted)). Accordingly, we have repeatedly upheld RICO convictions

premised on attempts and conspiracies as predicate racketeering acts. *E.g.*, *United States v. Houston*, 648 F.3d 806, 810–12 (9th Cir. 2011) (affirming RICO convictions based on predicate racketeering acts of conspiracy to commit murder, murder, and attempted murder); *United States v. Scott*, 642 F.3d 791, 794, 801 (9th Cir. 2011) (per curiam) (affirming RICO conviction based on predicate racketeering acts of conspiracy to commit murder); *United States v. Shryock*, 342 F.3d 948, 962–70 (9th Cir. 2003) (affirming RICO convictions based on predicate racketeering acts of conspiracy to commit murder, murder, attempted murder, conspiracy to aid and abet narcotics distribution, and conspiracy to extort). Moreover, our approach toward attempts and conspiracies aligns with that of the other circuits to have addressed the issue. *See, e.g.*, *United States v. Marino*, 277 F.3d 11, 28–31 (1st Cir. 2002); *United States v. Warneke*, 310 F.3d 542, 546 (7th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Jan. 10, 2003); *United States v. Pungitore*, 910 F.2d 1084, 1134–35 (3d Cir. 1990); *United States v. Manzella*, 782 F.2d 533, 537–38 (5th Cir. 1986); *United States v. Licavoli*, 725 F.2d 1040, 1044–45 (6th Cir. 1984); *United States v. Ruggiero*, 726 F.2d 913, 918–19 (2d Cir. 1984), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52, 61–63 (1997).

Rodriguez does not present a compelling reason to depart from the weight of this authority. Rodriguez relies on the Supreme Court's statutory interpretation in *Scheidler* to support her narrow construction of the RICO statute, but that case does little to advance her position. In *Scheidler*, the Supreme Court assessed whether the petitioners could be found liable for extortion within the meaning of the Hobbs Act and/or the RICO statute, where they had interfered with, disrupted access to, and sometimes fully shut down abortion clinics run by the respondents. 537 U.S. at 397–98, 404–05.

The Supreme Court held that the petitioners' actions fell outside the bounds of extortionate conduct under either statute, because even though they deprived or sought to deprive the respondents of their property rights, they did not obtain or attempt to obtain any property from the respondents. *Id.* at 404–10. The Supreme Court explained that extortion fundamentally requires that property be obtained from another, and the mere interference with or deprivation of another's property (as the petitioners had done) constituted a different offense entirely. *Id.* at 404–06. Contrary to Rodriguez's contention, *Scheidler* did not address the completed-offense/inchoate-crime distinction at issue here.[7]

Rodriguez latches onto *Scheidler*'s language that "for a state offense to be an 'act or threat involving . . . extortion, . . . which is chargeable under State law,' as RICO requires, the conduct must be capable of being generically classified as extortionate," *id.* at 409 (citation omitted), but inchoate variants of extortion *are* "extortionate." What the Supreme Court carved out from RICO's ambit was an entirely distinct offense (coercion), which bore some resemblance to extortion but lacked one of extortion's core defining elements.

Rodriguez next relies on our decision in *Franklin*, but again her reliance is misplaced. In *Franklin*, we evaluated

---

[7] If anything, *Scheidler* supports the district court's instructions by implying that attempted extortion and conspiracy to extort could qualify as RICO predicates, so long as the underlying conduct satisfies the fundamental requirements of an extortion offense. *See* 537 U.S. at 410 (explaining that claims of extortion, attempted extortion, and conspiracy to extort could not sustain a RICO conviction solely "[b]ecause petitioners did not obtain *or attempt to obtain* respondents' property" (emphasis added)).

the meaning of the term "involving," as used in the Armed Career Criminal Act. 904 F.3d at 800–02. We observed that "'[i]nvolving' does not have a single, uniform meaning, but it usually signifies something narrower than 'relating to.'" *Id.* at 801. We added that, "[s]pecifically, 'involving' often connotes 'includ[ing] (something) as a necessary part or result.'" *Id.* (quoting New Oxford American Dictionary 915 (3d ed. 2010)). We provided an example: "a crime 'involves use of explosives' where it actually constitutes the use of explosives; a crime *somewhat like* the use of explosives, or a crime *relating to* the use of explosives, does not necessarily 'involve[ ] use of explosives.'" *Id.* at 802. Rodriguez extrapolates from this discussion to argue that conspiracies and attempts to murder, extort, or traffic drugs cannot be considered acts "involving" the core offenses, because "[c]onspiracies and attempts to murder, extort, or deal in controlled substances do not include murder, extortion, or dealing in controlled substances 'as a necessary part or result.'" But Rodriguez takes the language of *Franklin* well beyond its context. Both *Franklin* and the cases on which it rests focus on how to assess offenses that have similar but not coextensive elements. They do not address the wholly separate relationship between completed offenses and their inchoate counterparts, and isolated quotes extracted from one context do not readily transfer to the other.

*Franklin* further noted, and Rodriguez emphasizes, that *Scheidler* taught that "the only crime that 'involv[es] extortion' is generic extortion; the word 'involving' does nothing to broaden the scope of that generic crime." *Id.* at 801. But that proposition, again, does not implicate the distinction Rodriguez seeks to address. All it dictates is that the "involving" language does not cast a broader net than conduct that satisfies the core elements of extortion; while it

precludes a distinct offense like coercion, it does not bar inchoate variants of extortion.

## C. Mid-Trial Instruction

Rodriguez contends that the district court, over her objection, gave an erroneous mid-trial jury instruction about the selection of the recordings introduced into evidence by the prosecution, thereby tilting the scales against her. The court gave the challenged instruction at the request of the government, which had argued that defense counsel's aggressive objections and cross-examination "improperly suggested that Officer Gallardo and perhaps other members of the Santa Ana Gang Task Force intentionally withheld relevant evidence from the government's counsel, defense counsel, and now the jury."

The court instructed the jury as follows:[8]

> [Y]ou heard testimony with regard to how the recorded passages you heard were selected. You also heard that the government did not prepare the complete transcripts for some recordings.

---

[8] Part of the instruction, not excerpted here, dealt with the government's ability to engage in stealth and deception, including the use of jailhouse informants. Rodriguez briefly asserts in a footnote that this part of the instruction constituted improper "vouching for a notorious jailhouse informant, without any balancing instruction that such testimony should be viewed with caution" and therefore "was also problematic." This passing reference, without any meaningful supporting argument, is insufficient to raise this as an issue on appeal. *United States v. Stoterau*, 524 F.3d 988, 1003 n.7 (9th Cir. 2008).

> Once the government produced a recording, any party was free to make its own transcription. An opposing party is free to request the Court to order additional portions of a recording be played where necessary to place the portions played in context or to avoid any misleading impression resulting from just the portions played.

Rodriguez contends that the court's mid-trial instruction misstated the law, bolstered the government's case, undermined the defense, and shifted the burden of proof, by suggesting that "both parties had equal ability to introduce recordings" even though she faced hearsay constraints that the government did not. She asserts that "the instruction suggested either that defendants had been dilatory in failing to request recordings be played, or that the court had already determined the selection of recordings was not, in fact, misleading"—and that, in either case, the court was inappropriately vouching for the government. She adds that it was a wholly permissible defense tactic to challenge the investigation as biased, and the court was wrong to undercut that approach.

The district court has "substantial latitude" in formulating jury instructions, *United States v. Hicks*, 217 F.3d 1038, 1045 (9th Cir. 2000), *as amended on denial of reh'g* (July 31, 2000), and we conclude that the court did not abuse its wide discretion in giving the curative instruction. First, the instruction aligned with the substance of Rule 106 and thus did not constitute legal error. *See* Fed. R. Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be

considered at the same time."). Second, informing the jury that any party *could* seek to present certain evidence is distinct from telling the jury a party was required to do so—and the remaining jury instructions eliminated any possible doubt as to the burden of proof. The jury was otherwise instructed that the defense did not need to present any evidence, and that the government bore the burden of proving every element of the charges beyond a reasonable doubt.

The instruction also did not preclude Rodriguez from arguing that the government's investigation was biased or conducted haphazardly. In fact, she repeatedly so argued, implicitly through cross-examination and explicitly during closing argument. Unlike the cases Rodriguez cites, the instruction here did not direct the jury not to consider potential methodological shortcomings or bias in the government's investigation, or to avoid drawing a particular set of inferences. Indeed, the instruction said nothing about how the jury should evaluate the evidence before it—except to remind the jury that, ultimately, "it is for you to determine the weight to be given any item of evidence." Therefore, we find that the district court did not abuse its discretion in giving its mid-trial instruction.[9]

---

[9] As the defense correctly points out, its strategy of attacking the investigation as biased, including arguing that the agents were biased in their selection of recordings presented to the jury, is a common one. Although we find no abuse of discretion here, the mid-trial instruction was unnecessary and, as formulated, ran the risk of being incomplete or potentially misleading. While the instruction was consistent with Federal Rule of Evidence 106, it failed to fully capture the restrictiveness of the rule of completeness, including the defense's need to overcome significant evidentiary hurdles. *See, e.g.*, *United States v. Collicott*, 92 F.3d 973, 982–83 (9th Cir. 1996) (discussing constraints on seeking

### III.  Dual Role Opinion Testimony

We now turn to Rodriguez's challenges to the dual role opinion testimony offered by two law enforcement witnesses for the government.  Rodriguez contends that the district court erred both in instructing the jury on such testimony and in admitting it in the first place.

We review a district court's admission of expert testimony or lay opinion testimony for abuse of discretion. *United States v. Gadson*, 763 F.3d 1189, 1202, 1209 (9th Cir. 2014).  However, we review de novo a district court's "construction or interpretation of the Federal Rules of Evidence." *United States v. Wells*, 879 F.3d 900, 914 (9th Cir. 2018) (citation and ellipsis omitted).

We review de novo whether a jury instruction misstates the law, although we review the "language and formulation" of a jury instruction for abuse of discretion. *Cortes*, 757 F.3d at 857.  Plain error review applies where the defendant failed to object at the trial level. *Murphy*, 824 F.3d at 1204.

### A.  *Jury Instructions*

Rodriguez contends that the district court did not properly instruct the jury regarding dual role witnesses.  She argues that the district court failed to distinguish between lay and expert opinion testimony, lumping all opinion testimony into a single category.  She asserts that the court's instructions not only failed to clarify the witnesses' various roles for the jury, and the significance of each, but also

---

the admission of hearsay statements through Rule 106).  We thus caution district courts in the use of jury instructions along the lines of the mid-trial instruction used in this case.

erroneously "elevated all their opinions to the status of expert opinions."

Rodriguez did not object below to the district court's dual role instructions, so plain error review applies.[10]  The court's instructions explained that two government witnesses, Officers Gonzalo Gallardo and John Feeney, had been permitted to "testif[y] in a type of dual role: They testified about facts they saw, heard, or learned as a percipient witness but also were allowed to express opinions based on their education, training, and experience."  The court urged the jury to "pay careful attention as to whether a witness testified to his personal knowledge as a percipient witness or testified to an opinion" and explained the caveats attendant to each role.  The court explained that, when witnesses provided opinion testimony, they might rely on facts outside their personal knowledge—but such testimony could not serve as proof of the underlying facts.  The court also admonished the jury that "[t]he fact that these witnesses were allowed to express those opinions should not cause you to give those witnesses undue deference to any aspect of their testimony or otherwise influence your assessment of the credibility of such witnesses."  The dual role instructions—including the distinction between fact testimony, on the one hand, and opinion testimony, on the other—closely tracked the corresponding Ninth Circuit model instruction.  *See* Ninth Circuit Manual of Model

---

[10] The only objection voiced by defense counsel was to eliminate any use of the term "expert" in the court's provisional instruction and replace it with the broader label of "opinion witnesses"—which the court did.  Thus, it is defense counsel's own phrasing of which Rodriguez now complains.

Criminal Jury Instructions, No. 4.15, Dual Role Testimony (2019).

We conclude that the jury instructions were not plainly erroneous. The district court addressed the two main areas of concern we have identified with respect to dual role witnesses: (i) that the facts on which an expert opinion is premised "should not be considered for their truth but only to assess the strength of his opinions"; and (ii) that the jury should not give undue deference to the testimony of an opinion witness, just because he has been permitted to testify in that capacity. *United States v. Vera*, 770 F.3d 1232, 1246 (9th Cir. 2014). The court's decision not to label Gallardo or Feeney as an "expert" in front of the jury further mitigated the risk that the jury would attach too much weight to the officers' lay testimony based on their dual witness status.

Although we find no plain error in the district court's instructions, we emphasize that trial courts should endeavor to explain clearly the differences between lay percipient testimony, lay opinion testimony (as governed by Rule 701), and expert opinion testimony (as governed by Rule 702) in settings where all three arise. In many cases, designating an umbrella category of "opinion testimony" may fail to provide an appropriate level of nuance to guide the jury's evaluation of dual role testimony.

## B. *Admission of Opinion Testimony of Officers Gallardo and Feeney*

Rodriguez also argues that the district court erred in admitting the testimony of Officers Gallardo and Feeney, to the extent they testified about the meaning of the intercepted

phone calls played at trial.[11]  Rodriguez contends that the court erroneously admitted the officers' opinions as expert testimony, although they testified to terms without fixed meanings and without a reliable methodology of interpretation.  Rodriguez further contends that the testimony would not be admissible as lay opinion testimony either—and that its admission "infected the entire trial" and prejudiced her defense.

We agree with Rodriguez that the district court erred in admitting some of the opinions of Gallardo and Feeney as expert testimony.  The district court appeared to misapprehend the parameters of expert testimony in the gang expert context, assuming that the officers' general qualifications sufficed to support the full range of opinion testimony they might give.  But as we have explained, to provide interpretive testimony concerning terms or phrases without fixed meanings, "an officer's qualifications, including his experience with [gang] investigations and intercepted communications, are relevant but not alone sufficient to satisfy Federal Rule of Evidence 702." *Vera*, 770 F.3d at 1241.  "Rather, Rule 702 requires district courts to assure that an expert's *methods* for interpreting the new terminology are both reliable and adequately explained." *Id.*

Of course, some of the testimony offered by Gallardo and Feeney indeed passes muster under Rule 702.  The officers' appropriate expert testimony included their opinions about the structure and operation of the OCMM, as well as their opinions concerning the meanings of terms with fixed meanings like "taxes," "green lights," or "hard candy

---

[11] Rodriguez does not challenge "the portions of the witnesses' testimony relating to the Mexican Mafia's organization, structure, methods of operations, roles, and members."

lists." *See id.* ("Officers may testify about their interpretations of 'commonly used . . . jargon' based solely on their training and experience." (citation omitted)); *United States v. Hankey*, 203 F.3d 1160, 1167–70 (9th Cir. 2000) (permitting police gang expert testimony where the officer had acquired relevant expertise through "street intelligence").

But when the officers began to opine about uncommon terms or phrases that they encountered for the first time in this investigation, the basis for their expert testimony in numerous instances grew thin. And when this occurred, the officers generally did not offer an explanation for how they arrived at their interpretations, nor did the court require them to provide one. At times when the officers did provide an explanation, some of those explanations failed to evince indicia of reliability or methodological rigor.

The district court uniformly treated all the officers' interpretive testimony as expert opinion, irrespective of the specific foundation for any individual interpretive statement. In so doing, the court misapplied the Rules of Evidence to the testimony before it.

As the government argues, some of the proffered expert testimony was appropriate for admission as lay opinion testimony based on the officers' firsthand experience with the investigation. But because the district court did not view any of the officers' interpretive testimony as lay opinion testimony, it did not require the officers to establish the requisite foundation for each such opinion. *See Vera*, 770 F.3d at 1243 ("[L]aw enforcement officers may offer lay and expert opinions about the meaning of intercepted phone calls, but the foundation laid for those opinions must satisfy Rules 701 and 702, respectively."). Therefore, while Gallardo and Feeney established the requisite personal

knowledge to support some of their lay opinions, they failed to do so in numerous instances, and those portions of their testimony were erroneously admitted.

We note that the district court's struggle to be a "vigilant gatekeep[er]" of the line between the two roles, *United States v. Freeman*, 498 F.3d 893, 904 (9th Cir. 2007), was compounded by its failure to bifurcate or otherwise clearly mark the distinctions in the officers' testimony as lay and expert witnesses. District courts should be cognizant of the "dangers" and confusion associated with allowing officers to give both lay and expert opinion testimony. *United States v. Torralba-Mendia*, 784 F.3d 652, 658 (9th Cir. 2015); *Vera*, 770 F.3d at 1242; *United States v. Anchrum*, 590 F.3d 795, 803 (9th Cir. 2009); *Freeman*, 498 F.3d at 903–04. To ameliorate this concern, we encourage district courts to "clearly separate the case agent's testimony between lay observations and expert testimony." *Torralba-Mendia*, 784 F.3d at 658; *see also United States v. Martinez*, 657 F.3d 811, 817 (9th Cir. 2011) ("The government was nearly always exact in specifying when it was asking for [the agent's] testimony as an expert."); *Anchrum*, 590 F.3d at 803–04 (explaining with approval how the district court "clearly separated" the case agent's testimony into different phases for lay and expert opinion to avoid the risks identified in *Freeman*). Careful separation of this testimony "avoid[s] blurring the distinction between [an agent's] distinct role as a lay witness and his role as an expert witness," as happened in this trial. *Anchrum*, 590 F.3d at 804; *Freeman*, 498 F.3d at 904. And clear demarcation of when officers are testifying in their lay or expert roles makes it easier to determine whether and how that testimony is supported by the proper foundation.

We next ask whether the erroneously admitted testimony was harmless. *Wells*, 879 F.3d at 923. Although we "begin with a presumption of prejudice[,] '[t]hat presumption can be rebutted by a showing that it is more probable than not that the jury would have reached the same verdict even if the evidence had [not] been admitted.'" *Jules Jordan Video, Inc. v. 144942 Can. Inc.*, 617 F.3d 1146, 1159 (9th Cir. 2010) (quoting *Obrey v. Johnson,* 400 F.3d 691, 701 (9th Cir. 2005)).

Upon consideration of the totality of the record, we find that the erroneously admitted testimony was harmless. The majority of the officers' testimony did pass muster under the Rules of Evidence. And three cooperating witnesses separately implicated Rodriguez in the conspiracies for which she was convicted—including particularly extensive testimony by cooperator Glenn Navarro. The phone calls themselves were admitted into evidence as well, amenable to interpretation through a combination of the admissible portions of Gallardo's and Feeney's testimony and the context provided by the percipient witnesses at trial. *Cf. Torralba-Mendia*, 784 F.3d at 662 (finding that the district court's error in failing to instruct the jury on how to evaluate gang expert's dual role testimony did not require reversal in part because evidence on which the expert based his testimony was provided to the jury, such that "the jury had the information it needed to evaluate [the expert's] opinions"). And the government's case was bolstered by the documentary evidence admitted at trial, including a series of prison correspondences and Mexican Mafia ledgers that further implicated Rodriguez. In the context of the full trial, the inadmissible evidence played a small role. We thus conclude that it is more probable than not that, without the erroneously admitted testimony, the jury would have reached the same verdict.

## IV.  Witness Exclusion

Finally, we address Rodriguez's argument that the district court improperly excluded a key defense witness, Teresa Cantu, who is Rodriguez's sister.  She contends that Cantu's testimony was relevant to her mental state and her defense that she participated in the recorded conversations not because she was a "Mexican Mafia secretary," but because she "never turned her back on anyone."

Below, Rodriguez proffered that Cantu would testify to the sisters' upbringing in a volatile home, Rodriguez's tendency to act as a "rescuer" and a "fixer," and Rodriguez's resolve not to let down or abandon anyone.  Cantu would also testify to Rodriguez's longstanding abusive relationship with her ex-husband Tommy, and Cantu's "belie[f] that [Rodriguez] put protecting Freddy, [her] son, above all else."

The government objected to Cantu's testimony as relevant only to "a pure jury nullification defense" and an "appeal to the sympathies of the jury."  In reference to Rodriguez's abusive relationship, the government added that Rodriguez had not properly noticed a duress defense—thus barring her from seeking to do so at trial.  Rodriguez responded that Cantu's testimony was relevant to her state of mind, and that her state of mind was material to the specific intent crimes of which she was accused.  She further argued that Cantu's testimony "goes to the voluntariness" of her statements and actions, amidst Tommy's threats and persistent abuse.

Reviewing the district court's exclusionary ruling for abuse of discretion, *United States v. Haischer*, 780 F.3d 1277, 1281 (9th Cir. 2015), we affirm.  Most of Cantu's expected testimony had little connection to the issues in dispute, and the district court reasonably concluded that

Cantu's testimony would unduly target the sympathies of the jury. For example, Rodriguez's tumultuous childhood would paint her as a more sympathetic defendant, but it had little to do with her guilt or innocence of the charges. Although the district court did not cite a specific evidentiary rule, it is clear from the record that the court undertook a Rule 403 balancing analysis and concluded that the probative value of Cantu's proffered testimony was substantially outweighed by the danger of unfair prejudice. That conclusion was a reasonable one.

The district court also did not err in concluding that at least some of Cantu's testimony went to an unpreserved duress defense.[12] Cantu would testify that Tommy (a principal conspirator) repeatedly threatened Rodriguez with violence, and that Rodriguez "lived in fear of Tommy." To the extent Rodriguez argued this testimony "goes to the voluntariness" of her conduct, the court correctly determined that Rodriguez was putting on a duress defense in all but name.

However, Rodriguez is also correct that evidence negating the mental state required for a specific intent crime is not coextensive with an affirmative defense of duress. *See Haischer*, 780 F.3d at 1283 ("Duress and the absence of the required *mens rea* are not the same thing."). Without relying on a duress defense, Rodriguez could argue that she acted out of a desire to protect herself and her family, out of fear from Tommy, or simply because she would never leave anyone behind, rather than with the requisite mens rea. That said, the Cantu proffer was extremely weak to the extent it spoke to any issues beyond duress. Cantu could provide

---

[12] Rodriguez does not dispute that she failed to preserve a duress defense.

only general background on Rodriguez, and Rodriguez's claimed motives were not inconsistent with knowingly conspiring to racketeer, or acting with the purpose of maintaining or increasing her position in the OCMM. Even if Rodriguez became involved with the organization with an eye toward protecting herself and her family, or out of an impulse to "rescue" others, that would not exonerate her.

We view the district court's rulings regarding duress and Rule 403 as intertwined, and we find that the court reasonably concluded that the only proffered testimony with meaningful probative value went to duress—and that all other testimony in the proffer carried minimal probative force, substantially outweighed by the risk of unfair prejudice. Therefore, we conclude that the district court did not err in excluding Cantu's testimony.

Based on our foregoing assessment of Rodriguez's claimed errors, and the totality of the evidence presented at trial, we likewise find that cumulative error does not provide a basis for reversal of Rodriguez's convictions.

**AFFIRMED.**