**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

ROBERT ALVIN JUSTUS, Jr.,

*Defendant - Appellant.*

No. 24-1641

D.C. No.
4:20-cr-00265-
YGR-2

OPINION

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted October 6, 2025
San Francisco, California

Filed December 19, 2025

Before: Jacqueline H. Nguyen and Daniel A. Bress, Circuit
Judges, and Richard D. Bennett, District Judge.[*]

Opinion by Judge Nguyen

[*] The Honorable Richard D. Bennett, United States District Judge for the
District of Maryland, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed Robert Alvin Justus, Jr.'s convictions for aiding and abetting the murder of a person assisting a federal officer and aiding and abetting attempted murder of a person assisting a federal officer, in violation of 18 U.S.C. §§ 1114(1), 1114(3), 1111, and 1112.

During a Goerge Floyd protest in 2020, Justus drove a van while his co-defendant, Steven Carrillo, fired nineteen rounds from an assault rifle at two Protective Security Officers on duty at a federal courthouse. One officer died from his wounds, and the other is permanently disabled.

At trial, the government presented 73 exhibits from Justus's social media activity to support its theory that Justus and Carrillo pre-planned the attack as part of their anti-government ideology. On appeal, Justus argued that the district court erred in admitting this evidence because it was irrelevant, constituted improper character evidence, and was highly prejudicial. The panel rejected these arguments. The district court did not abuse its discretion in finding Justus's social media posts and communications relevant to the crime charged and admissible under Fed. R. Evid. 401. The district court did not abuse its discretion in finding that the evidence was not impermissible character evidence under Fed. R. Evid. 404(a), as it was admitted for a non-propensity purpose: to demonstrate Justus's state of mind at the time of the attack. The district court properly reviewed Justus's

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

posts before deciding whether the probative value outweighed the danger of undue prejudice and did not abuse its discretion in admitting the social media evidence under Fed. R. Evid. 403.

The panel held that the district court did not err in instructing the jury that duress is not a defense, where Justus agreed that a duress defense was unavailable and the district court granted the government's request to bar Justus's invocation of duress as an affirmative defense. The district court, which allowed defense counsel to admit duress-like evidence to establish Justus's mental state, appropriately provided an instruction to help guide the jury on the parameters for which it could consider duress-like evidence.

The panel concluded that sufficient evidence supported the convictions.

---

## COUNSEL

Anne C. Hsieh (argued) and Jonathan U. Lee, Assistant United States Attorneys; Merry J. Chan, Chief, Appellate Section, Criminal Division; Patrick D. Robbins, Acting United States Attorney; Office of the United States Attorney, United States Department of Justice, San Francisco, California; for Plaintiff-Appellee.

Vicki M. Buchanan (argued), Vicki Marolt Buchanan PC, Sonoma, California, for Defendant-Appellant.

## OPINION

NGUYEN, Circuit Judge:

On May 29, 2020, during a George Floyd protest in Oakland, California, defendant Robert Alvin Justus, Jr. ("Justus") drove a van while his co-defendant, Steven Carrillo, fired nineteen rounds from an assault rifle at two Protective Security Officers on duty at the federal courthouse. One officer died from his wounds, and the other is permanently disabled. Following a twelve-day trial, the jury returned a guilty verdict against Justus on Count One, aiding and abetting murder of a person assisting a federal officer, and Count Two, aiding and abetting attempted murder of a person assisting a federal officer, in violation of 18 U.S.C. §§ 1114(1), 1114(3), 1111, and 1112. The district court sentenced Justus to life in prison on Count One and 240 months concurrent on Count Two.

Justus appeals his convictions and sentence. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.  Background

Justus was an active Facebook user. From mid-2019 until his arrest in June 2020, Justus liked, commented, and posted content on Facebook which advocated for violence against law enforcement and the courts, and conveyed a general animosity toward the United States Government. Many of Justus's posts used terminology related to the "Boogaloo" movement—a libertarian revolution and "impending politically-motivated civil war or uprising against the government" that had become a rallying point for extremists. For example, Justus referred to "Boogaloo" through the known shorthand "big igloo" or "big luau," and

discussed Boogaloo-related imagery, which included igloos and Hawaiian shirts. Justus also used the phrase "let's boogie" to refer to members' activities and recognized the terms "Alphabet Bois" and "Specialty Soup Bois" to represent various law enforcement agencies. Finally, Justus discussed engaging in a "hootenanny," or protest.

In May 2020, Justus shared a flyer for the George Floyd protest in Oakland on Facebook. Steven Carrillo, whom Justus had never met, commented that he was interested in attending. A day before the protest, Justus sent Carrillo a friend request on Facebook. Justus also commented "Let's boogie" on one of Carrillo's posts which announced that it was "a great opportunity to target the specialty soup bois," and linked to a video showing a large crowd attacking two law enforcement vehicles. Justus told a friend that he was meeting with Carrillo for the protest and stated that they were "gonna play with some creepers and spicy drinks . . . Maybe some pews and pops."[1] Although Justus claimed that his intentions for the night were non-violent, the jury heard evidence to the contrary.

On May 29, 2020, around 7:00 p.m., Carrillo picked Justus up from the San Leandro BART station in a white van. Justus testified that when he entered the van, he noticed that Carrillo was "fidgety and paranoid." Carrillo jumped into the back of the van and began pulling out guns. According to Justus, when he refused to carry a firearm, Carrillo pointed a gun at him and asked if he was "a cop or a rat." Justus

---

[1] At trial, Justus claimed that "pops" and "creepers" referred to fireworks and "crackling balls" he had purchased for the protest and that he assumed "spicy drinks" meant alcohol. Justus also claimed that he believed "pews" meant that Carrillo was going to "open carry" at the protest as an act of defiance.

claimed that he felt "panicked" and thought about leaving but feared that Carrillo would shoot him if he tried to leave.

Carrillo and Justus stayed in the parked van for about forty-five minutes. When Carrillo finished loading his gun magazines, he allegedly pointed an AR at Justus and directed him to drive to the IRS building in Oakland. The pair stopped once along the way to take the plates off the van.

Over the next two hours, Justus drove the van to and around downtown Oakland. Carrillo was agitated and, at various points throughout the night, threatened to shoot an AC transit bus driver, a couple who were arguing on the street, three officers in front of the IRS building, and a helicopter. Despite Carrillo's unstable state, however, Justus did not attempt to leave the situation. In fact, Justus twice left the van on his own but returned both times.

First, at 8:46 p.m., Justus left Carrillo in the van while he walked alone around the federal courthouse for about seven minutes. Justus testified that he returned to the van because, although he had his phone with him, he had left his backpack in the van with his identification and pictures of his children. On the second occasion, Justus parked the van at a corner at 9:28 p.m. with a direct view of the security guard shack outside of the federal courthouse. Justus once again walked around for about ten minutes near the protest. Although he had his backpack with him this time, he did not leave the scene.

Around 9:41 p.m., Justus returned to the van. A few minutes later, he pulled the van away from the curb and drove past the security guard shack outside of the federal courthouse. As the van passed the guard shack, Carrillo slid open the side rear passenger door and fired nineteen rounds from an assault rifle at the Protective Service Officers who

were standing guard. One officer died from his wounds, and one was seriously injured and became permanently disabled. According to Justus, he did not know that Carrillo was going to shoot. However, the video evidence at trial showed that Justus did not swerve or brake the van when Carrillo opened fire.

After the shooting, Justus drove back to Millbrae, where he lived, and parked the van about a mile from his apartment. The pair then parted ways. After walking back home, Justus disposed of the clothes and backpack he was wearing that night, erased all communications with Carrillo from his phone, and deleted his incriminating Facebook posts. Justus continued to interact with anti-police Facebook content and texted with Carrillo after the shooting.

On June 6, 2020, Justus learned that Carrillo had been arrested in a shootout with deputies in Santa Cruz, California. A week later Justus turned himself in and confessed his involvement with Carrillo to the FBI after realizing that he was being followed by undercover officers. During his interviews with the FBI, Justus maintained that he never intended to help Carrillo attack government officials on the night of May 29, 2020. Justus ultimately proceeded to trial, and a jury found him guilty on all counts. The district court sentenced Justus to life in prison.

## II. Discussion

### A. Justus's Social Media Posts and Communications

At trial, the government presented 73 exhibits from Justus's social media activity to support its theory that Justus and Carrillo pre-planned the attack as part of their anti-government ideology. Some of these Facebook posts included Justus's comments: "We should abolish the federal

government;" "If anyone thought we were going to have meaningful change through peaceful protesting and petitioning, you need to wake up. #buildabigigloo #timetodance #buildyournetwork;" "You guys ask why we have a bloodlust for police…;" and "Now is a good time for the bay to join in and storm police buildings." The government also admitted several posts and images that Justus had "liked," including a meme of a person shooting a police officer which read: "Speak to cops in a language they understand." Finally, the government presented evidence of messages that Justus had sent on Facebook. For example, in one message Justus stated, "[c]hange is inevitable, but I want to make a lasting change, not a Headline . . . [t]he correct violence is necessary," and in another he sent an image of two people holding guns on a rooftop which read: "when all else fails, vote from the rooftops."

Prior to trial, the district court reviewed each piece of social media evidence and extensively questioned the government on its intended use. Justus did not object to the admission of his social media posts which referenced the Boogaloo movement or tied him to Carrillo, but objected to 105 other social media posts and six of his social media conversations. The court ultimately excluded three of the posts as irrelevant but otherwise denied Justus's motion to exclude the posts and communications. The district court reasoned that the remaining evidence was "plainly relevant to the events at issue and [] probative circumstantial evidence of intent." As for the evidence that did not explicitly address Justus's plans to attack federal buildings and workers, the posts and conversations "nonetheless traffic in Boogaloo terminology (*e.g.*, the 'right to boog,' 'starting the boog') and are therefore relevant to Mr. Justus's ties to the Boogaloo movement and probative of intent." Finally,

the district court found that the posts and conversations were temporally relevant because they each occurred within six months of the shooting.

On appeal, Justus argues that the district court erred in admitting this social media evidence because it was irrelevant, constituted improper character evidence, and was highly prejudicial. *See* Fed. R. Evid. 401, 403, 404. We review the district court's evidentiary rulings for abuse of discretion and "if the district court erred, [we] usually then ask[] whether the error was harmless . . . ." *United States v. Preston*, 873 F.3d 829, 835 (9th Cir. 2017).

**i.**

Under Federal Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. According to Justus, the social media posts were not relevant to his intent because they did not include any concrete plans to incite violence. For example, Justus argues that his statements that he wanted to "burn it all down" are irrelevant because he was not charged with arson or destruction of property.

We conclude that Justus's social media posts and communications were relevant to the crime charged. First, Justus's advocacy for violence and physical attacks of law enforcement and the courts made it more probable that he intentionally aided Carrillo in the shooting of the officers. *See United States v. Boulware,* 384 F.3d 794, 805 (9th Cir. 2004). Second, the posts in which Justus used "Boogaloo" language supported the government's theory that Justus participated in the attack to further the Boogaloo

movement.[2]  Additionally, the fact that Justus had made these statements mere months before the attack, and he increased his social media usage shortly before the incident, supported the government's theory that his desire to commit acts of violence against law enforcement escalated over time.

Finally, contrary to Justus's contention, some of his social posts and conversations evidenced an interest in inciting violence.  For example, in response to one Facebook user who said he wanted to "go[] out in [sic] style," Justus asked: "Are you committed to doing this soon? . . . Like extremely soon?"  Further, Justus claimed that he was making "seed dispensers" and stated that his friend's shotgun will "come in handy."  Justus also expressed that he was "thinking of starting the boog," and that he wanted to "light up every damn federal office and child support/service building I can get to."  He further posted: "Now is a good time for the bay to join in and storm police buildings." Lastly, a jury could reasonably interpret his statements that he wanted to "burn it all down" as a metaphor for violence against the system and not a literal reference to arson.

Because the social media evidence tended to make Justus's intent to commit the crime more probable, the district court did not abuse its discretion in finding the

---

[2] Justus argues that the Boogaloo movement was seen as a campaign of protest, rather than a campaign of violence, citing to the government's expert witness.  But Justus ignores testimony by the same expert witness that the Boogaloo movement was escalating and expanding at the time of the attack and there were "some manifestations of violence by members of the Boogaloo" and criminal incidents where Boogaloo members confronted law enforcement.

evidence relevant and admissible under Rule 401.  *See* Fed. R. Evid. 401.

### ii.

Justus also argues that the social media posts constituted improper character evidence because the government used the evidence to "inform the jury of Justus's 'beliefs.'"  *See* Fed. R. Evid. 404.  Under Rule 404(a)(1), "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."   Fed. R. Evid. 404(a)(1).

The district court did not abuse its discretion in finding that the evidence was not impermissible character evidence because it established Justus's growing animosity toward the federal government and desire to commit violence against government actors, and not a specific character trait or criminal propensity.  Further, the evidence was not offered to establish that Justus acted in accordance with a specific character trait.  *See* Fed. R. Evid. 404(a)(1).  Rather, as the district court found, the evidence was admitted for a non-propensity purpose: to demonstrate Justus's "state of mind" at the time of the attack.  Consequently, the district court properly admitted the evidence under Rule 404.

### iii.

Under Federal Rule of Evidence 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Because Rule 403 requires a case-specific analysis, "[a] district court's Rule

403 determination is subject to great deference . . . ." *United States v. Hinkson*, 585 F.3d 1247, 1267 (9th Cir. 2009) (en banc).

Justus claims that the district court did not conduct an explicit Rule 403 analysis and, even if the court had conducted such an analysis, it erred in admitting the evidence because the social media posts were more prejudicial than probative. According to Justus, because the posts elicited an emotional reaction from the jury, "[i]t is likely a jury concluded Justus deserved to be punished for his beliefs and the memes he 'liked' regardless of whether he intended to help Carrillo . . . ."

Although the district court did not explicitly discuss Rule 403 in its written order regarding the social media evidence, the record shows that it engaged in this analysis. The district court extensively reviewed the probative value of the evidence in the context of the parties' Rule 403-related arguments and explicitly acknowledged Justus's argument that the evidence "would be unfairly prejudicial if admitted" when making its ruling. Further, the district court referenced Rule 403 in its written order on the other motions in limine. Finally, the court explicitly weighed the probative value and prejudice of similar evidence found on Justus's phone during trial. Thus, the record clearly shows that the district court considered the potential prejudice of the social media evidence and implicitly conducted a Rule 403 analysis. *See United States v. Basinger*, 60 F.3d 1400, 1408 (9th Cir. 1995) (finding that the district court's failure to explicitly conduct a Rule 403 balancing test did "not render admission of the evidence improper . . ., because the lower court implicitly made the necessary finding by admitting the evidence after expressly noting his awareness of Rule 403's balancing requirement").

Justus's reliance on *United States v. Curtin*, 489 F.3d 935 (9th Cir. 2007) (en banc) is unavailing. In *Curtin*, the district court allowed the government to admit stories found in the defendant's possession that contained graphic descriptions of sexual acts with minors in a sex trafficking case. 489 F.3d at 937, 956. We reversed the district court's evidentiary ruling because the district court relied on the government's offer of proof and did not read the stories itself. *Id.* at 957. On retrial, we cautioned the district court to fully read each of the stories and to consider editing the stories to avoid redundant material. *Id.* at 958. Here, unlike in *Curtin*, the district court reviewed each post admitted by the government, extensively questioned the government regarding the social media posts and conversations, and excluded three of the posts as irrelevant. And although the court did not have access to the posts prior to the hearing on the motion to exclude, defense counsel provided the court with a chart which quoted the posts verbatim and the court obtained the posts before issuing its written decision. Thus, the district court properly reviewed Justus's posts before deciding whether the probative value outweighed the danger of undue prejudice.

Finally, the district court did not abuse its discretion in admitting the social media evidence under Rule 403. The government admitted seventy-three posts and conversations, but they were not redundant. Many of the posts focused on separate issues related to Justus's intent, including his involvement with the Boogaloo movement, his desire to harm government officials and the courts, and his intent to take specific action and make or use weapons. Additionally, the numerous posts supported the government's theory that Justus's statements and animosity toward law enforcement

escalated over time. The evidence was therefore relevant and admissible.

## B.  Duress Jury Instruction

We next address Justus's challenges to the district court's jury instruction on duress. "We review the district court's 'precise formulation' of jury instructions for abuse of discretion." *United States v. Smith*, 831 F.3d 1207, 1214 (9th Cir. 2016) (quoting *United States v. Lloyd*, 807 F.3d 1128, 1165 (9th Cir. 2015)). We review de novo whether the instructions "correctly state the elements of the offense and adequately cover the defendant's theory of the case." *United States v. Liew*, 856 F.3d 585, 596 (9th Cir. 2017). "The relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *Id.* (internal quotation marks and citation omitted).

Prior to trial, upon Justus agreeing that the defense was unavailable, the district court granted the government's motion to bar the invocation of duress as an affirmative defense. But the court allowed defense counsel to admit duress-like evidence to establish Justus's mental state. To avoid confusion, the district court instructed the jury as follows:

> The parties dispute the facts. In general, the same evidence can be used to argue different factual conclusions.
>
> Duress is not a defense to the particular crimes charged here. Duress is defined in the law to exist where (1) there was a present, immediate, or impending threat of death or serious bodily injury to the defendant if the

defendant did not participate in the commission of the crime; (2) the defendant had a well-grounded fear that the threat of death or serious bodily injury would be carried out; and, (3) the defendant had no reasonable opportunity to escape the threatened harm.

While duress is not a defense to the particular crimes charged here, the government must still prove beyond a reasonable doubt that the defendant acted with the intent to help commit the charged crime.

The district court did not err in instructing the jury that duress is not a defense. Given Justus's testimony that he acted under Carillo's threats, there was a risk that the jury might conclude that Justus could advance a duress defense. The district court reasonably believed that an instruction was necessary because "jurors may, on their own, somehow think that duress is a defense." Thus, the district court appropriately provided an instruction to help guide the jury on the parameters for which it could consider the duress-like evidence.

We also conclude that the district court did not abuse its discretion in its formulation of the jury instruction. Justus argues that, by listing the elements of a duress defense in the instruction, the district court implied that Carrillo did not threaten Justus or that, if he did, Justus was not affected by the threats. However, unlike in *United States v. Haischer*, 780 F.3d 1277, 1283 (9th Cir. 2015) and *United States v. Rubio-Villareal*, 967 F.2d 294, 299–300 (9th Cir. 1992) (en banc), which Justus relies upon, nothing in the instruction

implied that the jury should ignore the duress-like evidence. On the contrary, the court added the final sentence—"While duress is not a defense to the particular crimes charged here, the government must still prove beyond a reasonable doubt that the defendant acted with the intent to help commit the charged crime"—to ensure that the jury considered the duress-like evidence. The district court judge gave the parties ample time to edit the instruction and added this language at the request of Justus's counsel, who responded: "[a]nother appellate issue resolved." The jury instruction also began with the sentence—"In general, the same evidence can be used to argue different factual conclusions"—which further emphasized that the instruction did not preclude the jury from considering the duress-like evidence. Thus, the jury instructions were not misleading or inadequate as a whole. *Liew*, 856 F.3d at 596.

Because the jury instructions accurately stated the law, adequately covered Justus's defense, and did not implicitly tell the jury to ignore any evidence, the district court did not abuse its discretion in instructing the jury regarding duress.

We hold that the district court did not err in admitting the social media evidence or giving the duress jury instruction; thus, we likewise find that cumulative error does not provide a basis for reversal of Justus's convictions. *See United States v. Karterman*, 60 F.3d 576, 579–80 (9th Cir. 1995); *see also United States v. Rodriguez*, 971 F.3d 1005, 1021 (9th Cir. 2020).

## C. Sufficiency of the Evidence

Finally, Justus claims that the evidence was insufficient to support his convictions. We review sufficiency of the evidence de novo. *United States v. Tuan Ngoc Luong*, 965 F.3d 973, 980 (9th Cir. 2020). "'[T]he relevant question is

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Bahena-Cardenas*, 70 F.3d 1071, 1072–73 (9th Cir. 1995) (quoting *United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994)). "[C]ircumstantial evidence is sufficient to sustain a conviction." *United States v. Harris*, 792 F.2d 866, 868 (9th Cir. 1986).

Justus falls short of meeting the high standard on sufficiency-of-the-evidence review.  The government presented evidence that Justus voluntarily met with Carrillo and drove the van containing weapons to and around Oakland on the night of the shooting.  According to video surveillance footage, Justus exited the van alone on two occasions and walked around downtown Oakland and the federal courthouse in a manner consistent with scouting the area.  Justus had his phone with him on both occasions, and his backpack during the second instance, but did not attempt to leave the situation or alert authorities.  Then, Justus drove the van while Carrillo opened fire on the guard shack and did not swerve or brake the van during the shooting.  Justus later destroyed evidence of his involvement in the attack and made alleged post-arrest statements to another inmate, Jose Lepe, which corroborated his intentional participation. Finally, Justus expressed his desire to harm federal law enforcement in the months leading up to the shooting on social media and admitted that he assumed Carrillo was going to bring a weapon to the protest.

Although Justus "offers a more innocuous alternative explanation for [his] conduct, we must view the evidence in the light most favorable to the government and presume the

jury resolved all conflicts against [him]." *Rodriguez*, 971 F.3d at 1011–12 (citing *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc)). The jury could have accepted Justus's innocent explanations, but it was not required to do so. *See Rodriguez,* 971 F.3d at 1012. Further, although Lepe's testimony may have contained inconsistencies, the jury was entitled to weigh Lepe's credibility and could have found that Justus intended to aid Carrillo absent this testimony. Therefore, sufficient evidence supported Justus's convictions.

**AFFIRMED.**